I would like to begin with the first issue presented for review in the merits appeal, an issue of statutory construction. And I characterize it that way because it's really not an issue local to copyright law. The issue is, of course, whether the lower court erred in construing the word employer in the 1909 Copyright Act's Work for Hire provision to subsume its opposite, commissioning party. And our position is that the lower court clearly did err. We rely in principal part on the United States Supreme Court's oft-repeated principle of construction for that very term. The principle of construction is that where the word employee or employer appears undefined or circularly defined in any federal legislation, it will be construed in accord with the common law of agency. What that means, and this Court has often repeated what I am about to say, is that employer is the opposite of commissioning party. Employee is the opposite of independent contractor. And that, from our perspective, disposes of the case. Let me just ask you a question. Why do we need a consistent approach to identifying whether someone is an employee across doctrinal areas? For instance, does the concern for a consistent approach outweigh the expectations of the parties who hold the copyrights to Works for Hire under the 1909 Act? Well, to answer that, from the perspective of the Supreme Court, the consistency that the Court is talking about is not local to the Works for Hire doctrine of the 1909 Act. It's not local to the 1909 Act. It's a principle that is across the board, every single piece of federal legislation. And the rationale that the Supreme Court stated for that broad rule of statutory construction, I believe, was best set forth in the Darden case, NLRB v. Darden, which is not a copyright case. The Court criticized the previous method for construing these terms, employee and employer, and employer as being result-oriented, policy-oriented. And in its new mode of what I suppose could be called textualism, for at least the last 15 years has taken the position that we, the courts, defer to Congress. If Congress wanted to include independent contractors in a statute, it could have done so. But where Congress uses this word, everybody in the country, irrespective of what the statute is, will know what the word means. So that's the rationale. What is the position of the plaintiffs? It's quite counterintuitive and, in our view, without any merit. The plaintiffs in their opposition concede the point regarding the word employee. That is, they agree that when that word appears undefined in a federal statute, it does indeed denote an independent contractor. However, they contest whether the cognate word employer is subject to the same principle of construction. And they castigate us for supposedly misreading the CCNV v. Reed case in that regard. In our persuading the Court that we're hardly stretching the Reed case, it says specifically when the words employer, employee, or, for that matter, scope of employment, appear undefined in a federal statute. They all are to be analyzed under the common law of agency, meaning the opposite of an independent contractor. Mr. Kerr, how do you respond to Judge Newman's conclusion in the Second Circuit decision, let's see, I believe it was Hobart, yeah, the estate of Berne Hogarth v. Edgar Rice Burroughs, where he tried to decide whether or not the CCNV decision should serve as a justification to change that long line of Second Circuit authority that seems to support the plaintiffs' position? The Second Circuit in the Hogarth case was presented not with our argument, but with a different argument. It was presented with one sentence from the CCNV v. Reed opinion that it called a historical statement. The historical statement by the Supreme Court was that generally under the 1909 Act, the cases construed the word employer as I am now presenting, the court in Hogarth characterized that statement as dictum, indeed weak dictum, and also noted that it had very strong Circuit precedent, and therefore the weak dictum of the Supreme Court could not overcome the strong Circuit precedent. I might note, I can say this out of a bit of personal experience, that it was not until the petition for certiorari in Hogarth that our argument was formulated. Indeed, it plagiarized some of our briefing below. So our argument was never presented in the Hogarth case, never considered by the Second Circuit. I guess I would also answer Your Honor's question by saying this Court, of course, is bound by the Supreme Court, not by the Second Circuit. Well, other than the fact that I was impressed by it, I mean, Judge Newman was certainly well aware of the CCNV decision in trying to decide whether or not that that should dictate a sea change in Second Circuit jurisprudence. Oh, yes, and he was troubled even by this one fleeting historical statement. One can only surmise, but I guess I would say hopefully when and if the Second Circuit is presented with the real argument that the word employer means employer, that will be viewed both as binding precedent from the Supreme Court and sufficiently strong to overcome the prior Circuit precedent. I guess I'll make another comment in response to Your Honor's question. Unlike the Second Circuit, this Circuit, I think it can fairly be said, does not have strong Circuit authority in support of what I call the rogue view that employer means independent contractor. For example, I believe the first opinion of this Court in Cleary, on which I believe Judge Nelson was on the panel, stated very clearly what I'm calling my view, that employer means employer and the relationship between an independent contractor and a commissioning party was one of an implied assignment rather than a vesting authorship in the commissioning party ab initio. We could talk about this Circuit's six or seven cases in detail, and it is difficult to harmonize them, but I do think it's fair to say that unlike the Second Circuit, which just bought into this view that the work for higher adoption applies to commissioning and the center of gravity of this Circuit's precedent is the opposite, indeed, another piece of evidence of that nature, after this Court in the May v. Morginelli case followed the Second Circuit's breakthrough or, I guess, off-the-tracks ruling in Brattleboro, this Court seemed to have misgivings about what it had done. In the Dumas v. Garmerman case, it stated what May had done and then criticized it as contrary to this Circuit's policy, that is, May over-rewarded the entrepreneurial initiative instead of creativity, and the issue of the interpretation of the 09 Act was not squarely before the Court in Dumas v. Garmerman. It was a 1976 Act case, but this Circuit seemed to go out of its way to signal that if we had to decide May all over again, we're not sure we would have come out that way. So on both grounds, the site to the Supreme Court that the plaintiff relied on in the Hogarth case, which was not a holding and really was weak dictum and the strength of the Court, I think the position of this Court in it is significantly different. Let me just amplify on what I characterized as this Circuit's stated policy in the Garmerman case. Let's say that the old style of statutory construction were appropriate. Look at the employer and you decide what is the mischief to be addressed, how should we construe it? Well, based on this Court's statement of policy, the result would still favor my client because this Court would construe the word employer narrowly, not to reward the money guy, but to reward the creator, the author, under that principle. There are plenty of other issues in the case. I just asked you a question. At the time Doubleday entered his agreement with Eisenhower, would copyright law have supported Doubleday's claim that the work was created for hire? No. The first case to expand the work for hire doctrine to commissioning parties was in 1966. As the Supreme Court stated in Reed, it was only during the last ten years of the old act, which is 66 through 76, or thereabouts, maybe 68 through 78, is when this line of cases emerged. And the first case, it's very easy to see it, it's like a sore thumb, is the Brattleboro Music case in the Second Circuit in the mid-60s, which the Fifth Circuit in Easterseal called the critical twist. And what it did was it said, we see no reason to distinguish between commissioning parties and employers. Period. And therefore we're going to, from now on, consider them both governed by the work for hire doctrine. So I guess the statutory language was not a reason to distinguish between the two. But in today's world of construing statutes carefully, that is a very good reason for distinguishing. The word employer connotes the exact opposite of what the Supreme Court did in the Brattleboro case. So in 1948, which is the, I think October 1, 1948, is the date of the assignment that Your Honor is referring to, there were zero cases of the, what I would call, anomalous sort. That didn't occur for almost, 40, 50, 60, 30 years later, 20 years later, 20-plus years later. Thank you. I think unless the panel has further questions at this time, I'm going to reserve my time with the Court's indulgence. Good morning, Your Honors, and may it please the Court. Mr. Gerber started with what he described as a question of statutory interpretation. I'd like to start in a different place, which is this Court's own prior opinion in this very case, and the District Court's subsequent trial and fact-finding on remand. In the prior appeal of this case, this Court held that there was a single, triable issue of fact, whether General Eisenhower intended the book, Crusade in Europe, to be a work for hire. As this Court said, questions involving a person's state of mind are generally factual issues that are resolved after trial and fact-finding, then on summary judgment, in accordance with some of the discussion that we've already heard this morning in other cases. This Court remanded for trial and fact-finding on that issue. A trial has now been held. The trial judge considered an extensive record, which included Eisenhower's own statements and correspondence, the statements of his son, John Eisenhower, not just his son, but his long-term business associate and editor, the live testimony of his own long-term editor, who the District Court specifically described as a very reliable witness. What that trial record uniformly showed, and what the District Court found on the basis of that record, is that, in fact, the answer to the question this Court asked last time was that, yes, General Eisenhower did intend for Crusade in Europe to be a work for hire. As I said, that factual determination is exactly what this Court sought in its prior remand. This Court certainly never suggested that the question could be resolved only one way, as Daystar is now contending on its appeal. If that were so, the remand would have been a trial, a waste for all concern. But, of course, the trial was not a waste. The District Court took evidence, reviewed an extensive record, and resolved the disputed issues of fact in favor of plaintiffs. As Judge Nelson reaffirmed the Court, quoting the late Judge Frank in the Three Boys Music case, if there is a trial, the conclusions on those issues of the trier of facts of the judge, if he sat without a jury, bind this Court on appeal, provided the evidence supports those findings. All right. Then I have a question about that, because if the copyright to a work for hire vests in the commissioning party as soon as it is created, what concerns me about this case, how could President Eisenhower have transferred the copyright to Doubleday by contract? According to the District Court's findings, again, after an extensive record, the contractual agreement was settled on December 31st, 1947. Let me emphasize the question this Court asked the District Court to consider under its own case law in determining when it is and why it is the copyright vests in the patron or proprietor, as opposed to the creator, in circumstances like this, when work for hire is at issue. The question, as this Court recognized in its prior appeal and has repeatedly recognized, is simply a question of the mutual intent of the parties. What did the parties intend? What did they want? What were they looking for? What did they expect to get out of it? That's the question at the heart of the work for hire inquiry under the 1909 Act. As this Court put it in the Lindbrook case, the question is the mutual intent of the parties that the title to the copyright shall be in the person who commissioned the work. Is that what they wanted? In May v. Morganelli, the question is, did the parties expect the employer to own the copyright? It's not a question of when did it convey. It's simply a question of what did they want when the work was completed and published? Determine that intent. This Court has always applied the instance and expense test. Under that test, as the Court is aware, where the commissioning party encouraged and was a motivating influence for the work and paid for the work, what the consistent line of cases, the unbroken line of cases, not just this circuit, but everywhere, and not one circuit, not one anywhere ever has accepted Daystar's view, certainly since the generation of this line of cases. Under that line of cases, when the commissioning party encouraged and motivated the work and paid for it, the presumption is simply that the parties must have agreed that the commissioning party would own the copyright and not the creator. Now that's rebuttable. As the Fifth Circuit described in the Easterseal case and the Second Circuit, Judge Newman put it in the Second Circuit case about Berne Hogarth, it's virtually irrebuttable, but it's not entirely rebuttable. It can be rebuttable, as this Court put it in both Lindbrook and in May v. Morganelli, if the evidence showed that despite the fact that somebody else, the patron, motivated the creation of the work and paid for the expenses to write the work, as happened here, despite that fact, the creator and the parties agreed that the creator would in fact reserve for himself the initial copyright of the work. If you can show that, if the party contesting the copyright can prove that as a matter of fact, then the presumption is rebutted. But under the instance of the expense test, it's a very strong presumption that when the patron goes out of its way to encourage and motivate and create the work, as the District Court does, and facilitates the creation of the work by paying for it, then the presumption is, well, of course, it's a natural presumption. Of course, the party must have agreed that the patron would own the copyright. Well, it's the evidence in support of that. As I said, the District Court had an extensive trial record on that, and probably for good reason, Mr. Gerber simply doesn't address any of that, not one word of that in his oral argument. Let me do so briefly, just so the Court understands the force of the Court's holding here, the District Court's holding here. First of all, there's the expense side. Not only does Mr. Gerber not address that in the oral argument, they don't touch it in the brief, because they can't. But leaving aside the fact that they concede it, it's important to emphasize just how strong the evidence was of expense going to establishing that the party must have believed that it was Doubleday, not Eisenhower, that owned the copyright. My suggestion would be that they didn't offer any evidence at all at the trial, that I assume their defense consisted of cross-examining Mr. Vaughn, and whatever evidence was submitted beyond that, they rested, right? Well, no, there's extensive documentary exhibit evidence they submitted. Both sides had, I believe, documentary evidence. They didn't have any live witnesses to rebut the testimony. So Vaughn was the only actual witness. The only live witness. But they disagreed with whatever they could disagree with, and whether or not they had documentary evidence contesting expense, they certainly don't contest it here. And I just want to address it, because it's not just a happenstance that, well, they paid for it. The investments that they made show that they and Eisenhower were in agreement that, yes, they would own the copyright in the book. They made enormous human and financial investments and resources to get this work written on the expedited schedule that both parties agreed it needed to be written on. They paid for round-the-clock secretaries. They flew Doubleday's top editor across the country to work with them on this. They paid for fact-checkers to check facts and do research to provide additional documentation. They paid for phone bills, copying, some of the other expenses that come up in trying to get a work like this written on an expedited schedule. Wouldn't Doubleday already have held the copyright? Are you saying it was the intent of the parties? I mean, if they already held it, there would be no need to transfer it. But you're arguing that the evidence was that they did not intend. The evidence was the contract was reached and the district court found, and now Daystar doesn't contest an appeal, that by the agreement that was settled by December 31st, 1947, enforceable legal contract, the agreement was that Eisenhower would write a book for Doubleday that would be as a work-for-hire, so that when the federal copyright came into existence upon publication later in 1948, that would be as a work-for-hire in which the initial copyright would vest in Doubleday. That was the agreement settled in October and December of 1947 according to the district court's findings. And that's under the work-for-hire test, remember. All of this is just evidence, part of the totality of circumstances designed to get at what it is the parties wanted to accomplish through whatever legal transactions they structure  The agreement was, according to the district court's findings, not contested now in appeal, that Eisenhower was a contract in December 1947 that Eisenhower would write a book for Doubleday and that agreement would be that Doubleday would pay for the book. The uncontested testimony is that Doubleday encouraged and motivated the creation of the book and that at the end of the day, Doubleday, not Eisenhower, would own every last right. Remember, the uncontested testimony from Eisenhower himself in his own book, At Ease, was that when he was talking to Doubleday in the Tribune in 1947, he said, I didn't want to, he says this in his book explicitly, I didn't want to be bothered with all kinds of rights. He says if you can tie this up in a single package to cover the whole affair, that's when I'll do this. That's the circumstances under which I'll do this. That's what he wanted. He didn't want to own any rights in this book. Contrast that, your honor. Contrast that with other books he wrote after this. But what about the tax treatment in this case? Doesn't that support the idea that Eisenhower always perceived himself to be selling a product to Doubleday and not selling Doubleday his services? Two answers to that, your honor. First of all, at the very most, just as your honor just put it, is exactly right, at most it supports the position that Daystar is taking. That's what the court held in the last appeal, that summary judgment wasn't appropriate because the tax treatment creates a triable issue of fact because one might infer, as a matter of fact, that Eisenhower had a different state of mind. This court didn't suggest by any stretch that it was conclusive of and dispositive of the copyright question. The reason for that is simple. It's exactly what the district court found in its findings of fact and conclusions of law below, which are the particular point passages were printed at page 120 of the supplemental excerpts of record. The reason for that, the reason this tax treatment is conclusive of work-for-hire status, and the district court didn't find it either, is that tax law and copyright law are often treated differently. They often come to different conclusions. As this court said in the case cited by the district court in the DI operating case, performance for profit, that concept, that in fact those explicit words are treated differently under the tax laws and the copyright laws. As the Irving Berlin case, a court of claims case said, copyright loyalties are treated differently. And as the Southern District of New York case, Frederick Muzik, cited by the district court says, the phrase renewal period can have different meaning under tax law and copyright law. There's nothing particularly controversial about that. Daystar cites some cases that suggest that in those particular circumstances, the one can govern or can be significantly influential of the other. That can be true too. It's our point. It's our point not that tax law is irrelevant. It doesn't mean anything at all. It can mean something. And if there is evidence to show that the tax treatment Eisenhower received completely changed the practical realities, the unrebutted evidence frankly, the unrebutted evidence that he wanted to write this book for Doubleday and agreed to write this book for Doubleday as a work for hire because of the fact that he wrote it only because Doubleday encouraged him to do so and because Doubleday paid for the creation of the book. The presumption that arises there is that he wanted that book, the initial copyright to vest, the initial federal copyright to vest in Doubleday and didn't want to own it for himself. That's the test this court has repeatedly applied and there's no basis for concluding that the district court erred as a matter of fact in deciding that the tax treatment, while relevant, didn't change the practical realities that this is exactly the kind of contract, exactly the kind of relationship and exactly the kind of book that the parties want to write. Consider the other evidence. I didn't look to see, but did Doubleday also publish and market the other books that he wrote later at ease and the memoirs of his White House years and so on? I don't know off the top of my head if they wrote all of them, but the books are, there is evidence in the record and it's just true as a matter of historical fact that those books were treated differently and that's an important point you're trying to raise. My follow up question to that is, how do we explain the difference? Why was he so set to transfer title with regard to this book when he obviously recognized and maybe later came to realize that it was better to have the royalties and an annuity over the years? There's at least two reasons. First of all, this is the first book he'd written and he said specifically, I don't want to be bothered with those publishing rights in this context. But he wouldn't mind being bothered going to the bank periodically to... No, that's what's important. In this case, he got a lump sum. That's what's different about this case. Later on when he begins to write more books and maybe he realizes it's more beneficial for him to own the copyright, he reaches a different relationship. The inference to me, at minimum, it's a debatable inference, it's for the district court, not for us or this court, but clearly the stronger inference is that the difference between the treatment in the subsequent books and this book is indicative of the fact that this book was intended to work for hire. Speaking of other books and subsequent events, it's important to emphasize the fact that nobody, and I mean nobody, anywhere around this transaction ever contested or suggested that Doubleday did not own the initial copyright in the book as a work for hire. Eisenhower never denied it. John Eisenhower, his son, the heirs who stood to benefit didn't deny it. Nobody else in the family denied it. Nobody else with any relationship with this transaction whatsoever ever suggested that it was Eisenhower who owned the initial copyright and not- Well, that could also be explained by the fact that, and I'm sure that the general slash president was well advised by legal counsel, that had he taken that position it would have jeopardized his tax position because either he sold a capital asset and got favorable long-term capital gains tax treatment or he faced the possibility that he could be audited and have to pony up a substantial more money in taxes if the determination was made that he still owned it, right? Well, except that we don't know now, as we sit here now, now the tax laws have changed, partly in response to this transaction. We don't know exactly what the IRS and the Treasury Department, you know, how they would have treated this had there been an audit. We don't know what the answer is. And the reason is- And that was my second point, which is that however he structured it in order to get that tax treatment, in order to have it labeled a capital asset because he was an amateur author and he held it for six months, I don't want to say it's irrelevant, but as a district court found it's certainly not dispositive of the work for hire question, which is the quite different one as to who encouraged it and who facilitated the writing of the work by paying for it and thereby who, which party did the parties intend to own that initial copyright? That's the work for hire question. It's a separate question from tax law. Does that explain how Eisenhower could have transferred the copyright to Doubleday by contract? There's another answer to that one, Your Honor, and that is simply there are numerous cases, including this Court's cases that say, and they're cited in our briefs, that say an assignment, the mere fact that you assign rights to a book, this is separate from the tax treatment specifically, but the mere fact that you assign rights to a book doesn't affect or doesn't rebut the work for hire presumption, the presumption that rises out of that. In the Lindbrook case itself, this Court's seminal case on this point, in the Lindbrook case itself there was a contract where the creator of the work said, I hereby assign rights, and the Court said, that doesn't tell us that he didn't want the rights to vest initially in the proprietor. It doesn't rebut the presumption. The presumption is that strong. That was the square holding of the Lindbrook case, and there's other cases that I say, cited in the brief, the Bern-Hogarth case is another one, where as part of the formalities, the legal structuring of the transaction, the parties write, I hereby assign rights, but that doesn't undermine or change the fact that under copyright law, however they structure it, what we're asking is who encouraged it and who paid for it, and what the presumption that arises out of that. Under the 1909 Act, as this Court has repeatedly held, excuse me, I don't want your time to run down before you get to a side issue that's not primary, but at some point the Court's going to have to decide it, and that's the fact that you were, that non-taxable costs were awarded to your side in this. There are many issues, to be sure, I would love time to address. The non-taxable issues, I think under the language of the statute is quite an easy one, which is under 1920, you get taxable costs as a matter of course if you're the prevailing party. That's just the way it works in any case. You don't always get fees, but you get costs in every case. The non-taxable costs under Section 505, it says you get your fees and your full costs. That language is totally surplusage, a huge waste of statutory time to say full costs if you're already going to get them anyway. Full cost has to mean, to my mind, if it means anything at all, something more than costs you'd already get anyway. Full costs mean, as the word says, full costs, all your costs, not just those you'd already get. That's what I think the right interpretation of that statute is, and the two cases cited by JSTAR don't come to terms with that at all. In fact, there's only one case that really decides the question, the other one just follows it, and I think that's the answer to that question. Let me go back briefly. And the amount, given the size of the judgment, what are we talking about here? On the costs? The non-taxable costs is pretty small. I think it's like $36,000. I can't remember the precise number, but it's below $100,000. It's not a big-ticket item, but it's, to our mind, our statutory entitlement under the circumstances given the Court's exercise of discretion. Let me say one other thing about the tax treatment, Judge Nelson, and that's that even Daystar's theory doesn't work. If you think the tax treatment, or want to believe the to get the tax treatment that Eisenhower wanted to get, and there's nothing wrong with that, remember, he's just trying to minimize tax obligations, and he gets advice about how to do that. That's what people do all the time, and a case they cite describes it as a loophole. He got through a loophole. I don't think that's a problem. But to get that tax treatment, he had to agree that he would convey all rights forever of all kind. Well, under Daystar's theory, he didn't do that. He didn't do that because he retained for himself a family reverter of the right to renew upon his death. So the tax treatment wouldn't work. Now, I'm not saying that that proves that our view of the tax, it doesn't really prove much of anything except that, and this is the dispositive point, that copyright law and tax law are different. You can't always look to the one to say whatever result here must prove what the result over there must be. It doesn't work going from copyright to tax law in every case, and it doesn't work going from tax law to copyright in every case, and it certainly doesn't work here. But it's relevant in determining the intent of the parties, is it not? Absolutely, and that's what this Court held in last appeal. We don't dispute that at all. It's a relevant factor, but as you said in the three boys case, another copyright case, and this Court talked about at length this morning, it's relevant as a question going to state of mind, what the intent of the parties was. The District Court considered that argument at length, addressed it in the findings of fact and said, while relevant, I don't believe it undermines what the practical reality of the situation is, and the virtually unrebutted testimony, the completely unrebutted testimony that the 20th Century Fox paid for the work made enormous investments, counting on, counting on, owning the initial copyright and was a party responsible for creating it. And given those facts and the facts that this book was treated differently from other books that we know are now intended to be works for, intended not to be works for hire, it's quite clear that the findings are supported by evidence and therefore must be affirmed.  Thank you very much. Mr. Gerber? I want to primarily address Judge Nelson's question regarding the effect of the assignment, but before I do that, I think it will be more efficient for me to first respond to Judge Ferris' comment about non-taxable costs and then Judge Tolman's factual question about why Eisenhower did a royalties deal for his subsequent books. The argument presented by my adversary here on non-taxable costs that the statutory phrase full costs extends the awardability to non-taxable has been rejected by both circuits which consider it. The language has to be much more specific. It has to, for example, authorize expert fees as costs, and the mere phrase full costs has been held to be inadequate. There's no court that has sustained that view. So what's the purpose, then, of Section 505 language? Is it just an inartful term that Congress used? The phrase full costs in the copyright statute, I don't know about inartful. Inartful is a bit anomalous. It also includes attorney's fees. Well, that certainly can't be inartful. I'm sorry? Attorney's fees. We don't want that to be inartful, right? That's right. Okay. All right. Let's just focus on costs. I mean, if it doesn't mean something more, why didn't they just say, you know, cross-reference to 1920? I can't answer the question through legislative history, but I would surmise that full costs was intended to be synonymous with all costs that are otherwise awardable. The two circuit opinions that I referred to do not explain in detail the rationale for their construction of full costs, that it is narrow. Were those cited in your brief, the two circuit opinions to which you are referring now? The two circuit opinions, one of them is Artisan and the other, I can't remember. They are both cited in the brief. That's fine. Thank you. In both the moving and reply briefs. As for Judge Talman's factual question, why did Eisenhower do a royalties deal later? Well, one answer is that, as we footnote somewhere, the loophole that Eisenhower took advantage of in 1947 disappeared in about 1950 with what Congress called the Eisenhower Amendment. It was quite a controversy. Eisenhower made a lot of money and it was viewed with alarm by many citizens. And Congress took rather immediate action. So capital gains was not, treatment was not available subsequently. That's one answer. Another answer, which I know is in at least one biography of Eisenhower, I don't know if it's in the papers, is that mathematically it turned out to be a disaster for Eisenhower to do a capital gains deal on campaigns on a crusade in Europe, because even though the ordinary income level was confiscatory, he would have made a lot more if he had done royalties because the book was an amazing bestseller for decades. As for Judge Nelson's questions regarding the effect of the assignment, an assignment is the direct opposite of a work for hire arrangement. An assignment means that there's an initial copyright owner and a subsequent copyright owner. So it is evidence that robots work for higher status. It is true that extrinsic evidence is admissible because there are quirky situations in which what looks like an assignment isn't really. However, interrupt you, but at some point you want to get to his findings of fact, the fact that there was a trial and there were findings and we have that result before. Yes. And in this regard specifically, there is no factual dispute regarding the assignment. And and the court erred in a way which I will describe. Our position is that the assignment was executed and effective on October 1, 1948. Plaintiff's position is that the formation date of the contract was December 30, 1947. But they themselves urged that the content of the contract was a deferred assignment. The contract, the handshake in December 47, was that Eisenhower's rights will be granted six months after he completes the manuscript. Why did the court error? The court mixed up, conflated the contract formation date, which factually she found in favor of plaintiffs on. And we're not contesting that with the assignment date. There was no disputed evidence that there was a deferred assignment on either party's view. So there really is no dispute. As for the extrinsic evidence, which in, as I say, oddball situations could show that an assignment isn't what it seems to be. There was no extrinsic evidence of that sort. The extrinsic evidence in this case was Eisenhower did a deal with the IRS that could not exist if this were work for hire. The asset could not be a capital asset held by him if it were work for hire. He could not have held it for six months if it were work for hire and he could not have assigned it. All three elements of capital gains treatment are impossible. Mr. Gerber, if you were drafting the assignment contract in October 1948, wouldn't you want to include on behalf of Doubleday a provision that made it clear that Doubleday owned the copyright so that it would stand as a defense or give you the ability to prove ownership if there were ever claims of infringement that were litigated in the future? In other words, if you were the commissioning party, don't you want to make it crystal clear not only to the independent contractor, but also to the world at large that to the extent that there's any question as to whether it was Eisenhower or Doubleday who had the copyright, wouldn't you put language into the agreement that made it clear that it was Doubleday? Yes, and Douglas Black, the editor of Doubleday, was a lawyer and did that. But the language he chose was not this shall be a work for hire owned ab initio by Doubleday from the date of creation, but rather as of this date, hereby, October 1, 1948, which is almost exactly six months after Eisenhower completed the manuscript, delivered it for Eisenhower. But we know the explanation for that, right? Eisenhower didn't want any suggestion as far as the IRS was concerned that there was a handshake deal in December 1947. So he wouldn't want language like that in there because presumably the IRS may have received a copy of that contract if they ever audited the tax treatment. Well, I'm not sure, actually, from a tax law perspective, whether the IRS cares whether there was a handshake deal earlier. But it does care that there be no transfer of the literary work, the copyright, until six months after completion of the work. So I don't really question Eisenhower's motives. I think he was trying to comply with his understanding of what the IRS required. Just I don't know if I completely answered your on this previous question. It just seems to me that it would be prudent if one is in the publishing business to make sure that there is evidence that is clear and unimpeachable, that you are the current and lawful owner of this copyright from now and forever. Right. And there are two types of hire somebody to do some work for you. You want to foreclose any future claim by either that party or heirs of that party down the road who might later come back and say, wait a minute. You know, this is our copyright and we're entitled to. And there are two ways to do that as a prudent publisher. An assignment is one work for hire agreement is the other. And both were frequently used. But I guess my question is, why wouldn't you include that language in both agreements? No, no. An assignment is the opposite of a work for hire agreement. Oftentimes you'll see you and I are talking past one. Oh, excuse me. I mean, it's a real practical question. I'm trying to figure out if I'm in the publishing business, regardless of how I characterize my relationship with the other party, whether we call them an independent contractor or the author or whatever you want to call. Don't I want to make sure that the contract contains a provision that makes it clear that the copyright is mine? Yeah. Yes. OK, that's it. This I hope I'm responding. But there are mixed agreements and double they could have used one of those. That is, we and you generalize and how are treating this as a work for hire. We double day are the owner and author. If a court someday finds that it's not really a work for hire, then you hereby assign to us your rights. And that would have been evidence that double day and Eisenhower intended it, at least initially, to be a work for hire. This was a pure assignment by a very sophisticated lawyer. And Eisenhower was represented by all these white shoe tax lawyers from New York. The best of the best. So I guess that remains to be seen. Well, people whose reputation reputationally were the best. Let's put it that way. I think you're three minutes over. Oh, excuse me. I apologize. All right. Unless you have some one other last thing you want to say. Well, well, if the court's inviting it. Yes, I will. And cutting you off, of course, permitting it quick. I just wanted to get back to Judge Nelson's question regarding the extrinsic evidence that might show that this assignment is not an assignment. The plaintiff's proper two things. First, they say the double day invested a lot of money, but that is not compatible only with work for hire treatment. That's also compatible with having a handshake deal and knowing Eisenhower is going to be your author. And the other extrinsic evidence they proffer, which I guess I already talked about, is that Eisenhower entered into an agreement in December of 47. That does not show that this is a work for hire agreement. Indeed, the evidence is that that December agreement was a deferred assignment. Thank you very much. Okay. Thank you. The case is submitted and we'll hear arguments.
judges: Farris, D.W. Nelson, Tallman